**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**
Caption in compliance with D.N.J. LBR 9004-2(c)

**McCARTER & ENGLISH, LLP**
Charles A. Stanziale, Jr.
Jeffrey T. Testa
Brian L. Baker
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
Telephone:  (973) 622-4444
Facsimile: (973) 624-7070

*Chapter 11 Trustee and Counsel to Chapter 11*
*Trustee*

In Re:

**SOLOMON DWEK,** *et al.*

                          Debtors.

Lead Case No.:  07-11757 (KCF)
(Jointly Administered)

Chapter 11

Judge: Kathryn C. Ferguson

**FIRST AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE DESCRIBING FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY THE CHAPTER 11 TRUSTEE**

**PLEASE READ THIS FIRST AMENDED DISCLOSURE STATEMENT CAREFULLY. THIS FIRST AMENDED DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN OF ORDERLY LIQUIDATION.   THE TRUSTEE BELIEVES THAT THE FIRST AMENDED PLAN OF ORDERLY LIQUIDATION IS FAIR AND EQUITABLE.  THE TRUSTEE URGES THAT THE VOTER ACCEPT THE FIRST AMENDED PLAN.**

Dated: December 3, 2009

**CHAPTER 11 TRUSTEE FOR THE JOINTLY ADMINISTERED DEBTORS**

By:    /s/ Charles A. Stanziale, Jr.
          Charles A. Stanziale, Jr., Chapter 11 Trustee
          for the Jointly Administered Debtors

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................6

II.     DESCRIPTION OF THE DEBTORS, FINANCIAL ENTANGLEMENTS AND
        REASONS FOR THE DEBTORS' CHAPTER 11 FILINGS .....................................13

        A.      The Debtors ..................................................................................................13
        B.      Appointment of Fiscal Agent and the Further Effective Substantive Consolidation
                of the Jointly Administered Debtors Prior to the Dwek Petition Date .................22
        C.      Events Leading to and Reasons for the Chapter 11 Filings ..................................24

III.    THE CHAPTER 11 CASES ...............................................................................28

        A.      Commencement of Bankruptcy Proceeding ........................................................28
        B.      Employment of Professionals ...........................................................................28
        C.      Claims Process and Bar Dates ..........................................................................31
        D.      Post-Petition Operations ..................................................................................32
        E.      Sale of Real Estate ..........................................................................................33
        F.      Motions for Relief from the Automatic Stay .......................................................34
        G.      Commencement of Litigation ............................................................................35
        H.      Pearl Dwek Settlement ....................................................................................36
        I.      Joseph Dwek Settlement ..................................................................................37
        J.      Jubilee Settlement ..........................................................................................39
        K.      Solomon Dwek Disclosed as Cooperating Witness in Government Political
                Corruption and Money Laundering Cases. ..........................................................40
        L.      Solomon Dwek Guilty Pleas in Federal and State Court. ......................................40
        M.      Trustee's Best Estimate of Summary of Present Assets and Liabilities on a
                Consolidated Basis ..........................................................................................40

IV.     SUMMARY OF THE PLAN ...............................................................................43

        A.      Introduction ...................................................................................................44
        B.      Voting Procedures and Requirements ................................................................44
        C.      Confirmation Procedure ...................................................................................47
        D.      Classification of Claims and Interests and Their Treatment Under the Plan ...........52
        E.      Means for Execution of the Plan .......................................................................66
        F.      Preservation of the Debtors' Claims, Demands and Causes of Action ...................76
        G.      The Litigation Claims Recoveries ......................................................................76
        H.      Procedure for Determination of Claims ..............................................................77

V.      THE LIQUIDATING TRUSTEE .........................................................................79

        A.      Appointment of the Liquidating Trustee .............................................................79
        B.      Duties of the Liquidating Trustee ......................................................................80
        C.      Reporting Requirements/Effect of Failure to Object ............................................81

|  | D. | Powers of the Liquidating Trustee | 82 |
|  | E. | Tenure, Removal and Replacement of the Liquidating Trustee | 84 |
|  | F. | Compensation and Reimbursement of Liquidating Trustee and His Professionals | 85 |
|  | G. | Reserves | 86 |
|  | H. | No Right in Assets | 87 |
|  | I. | Limitation on Liability of the Liquidating Trustee | 87 |
| **VI.** | **TREATMENT OF EXECUTORY CONTRACTS & UNEXPIRED LEASES** | | **88** |
|  | A. | Rejection of Executory Contracts and Assumption of Unexpired Leases | 88 |
|  | B. | Rejection Claims Bar Date | 88 |
| **VII.** | **DISCHARGE** | | **88** |
| **VIII.** | **MODIFICATION OF THE PLAN** | | **89** |
| **IX.** | **CONDITIONS TO THE EFFECTIVE DATE** | | **89** |
|  | A. | Conditions to the Occurrence of the Effective Date | 89 |
|  | B. | Waiver of Conditions | 89 |
| **X.** | **RETENTION OF JURISDICTION** | | **90** |
|  | A. | In General | 90 |
|  | B. | Plan Disputes and Enforcement | 90 |
|  | C. | Further Orders | 91 |
|  | D. | Sales of Assets | 91 |
|  | E. | Governmental Units or Regulatory Agencies | 91 |
|  | F. | Final Decree | 91 |
|  | G. | Appeals | 91 |
|  | H. | Executory Contracts and Unexpired Leases | 92 |
|  | I. | Other Claims | 92 |
| **XI.** | **GENERAL PROVISIONS** | | **93** |
|  | A. | Dissolution of the Committee | 93 |
|  | B. | Oversight Committee | 93 |
|  | C. | Termination of Fee Auditor | 95 |
|  | D. | Reimbursement of Dwek Expenses and Monthly Stipend | 95 |
|  | E. | Exemption from Transfer Taxes | 95 |
|  | F. | Extension of Payment Dates | 96 |
|  | G. | Notices | 96 |
|  | H. | Closing of the Case | 96 |
|  | I. | Interest | 97 |
|  | J. | Confirmation By Non-Acceptance Method | 97 |
|  | K. | Vesting | 97 |
|  | L. | Severability | 97 |
|  | M. | Governing Law | 98 |

N.    No Admissions or Waivers ...................................................................98
O.    Successors and Assigns........................................................................98
P.    Fractional Dollars.................................................................................98
Q.    Minimum Distribution .........................................................................99
R.    Exculpation ..........................................................................................99

**XII.    CERTAIN TAX CONSEQUENCES OF THE PLAN.............................................100**

**XIII.    RECOMMENDATION AND CONCLUSION .........................................................102**

THIS FIRST AMENDED DISCLOSURE STATEMENT (the "Disclosure Statement"), THE FIRST AMENDED PLAN OF ORDERLY LIQUIDATION DATED December 3, 2009 (the "Plan") ANNEXED HERETO AS <u>EXHIBIT A</u>, THE ACCOMPANYING BALLOTS AND RELATED MATERIALS DELIVERED HEREWITH ARE BEING PROVIDED BY THE CHAPTER 11 TRUSTEE TO KNOWN HOLDERS OF CLAIMS AND INTERESTS PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE IN CONNECTION WITH THE CHAPTER 11 TRUSTEE'S SOLICITATION OF VOTES TO ACCEPT THE PLAN PROPOSED BY THE CHAPTER 11 TRUSTEE.

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., EASTERN STANDARD TIME, _____, 2010, UNLESS EXTENDED BY ORDER OF THE BANKRUPTCY COURT (DEFINED BELOW).  YOUR VOTE ON THE PLAN IS IMPORTANT.**

**THE CHAPTER 11 TRUSTEE BELIEVES THAT THE PLAN WILL ENABLE THE ESTATES TO EFFICIENTLY LIQUIDATE THEIR ASSETS FOR THE BENEFIT OF ALL OF THEIR CREDITORS AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11.  ADDITIONALLY, THE CHAPTER 11 TRUSTEE BELIEVES THE PLAN PRESENTS THE MOST ADVANTAGEOUS OUTCOME FOR ALL THE DEBTORS' CREDITORS AND THAT, THEREFORE, CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE ESTATES.  THE CHAPTER 11 TRUSTEE RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.**

BY ORDER DATED _____, 2010, THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION TO PERMIT THE HOLDERS OF CLAIMS AND INTERESTS AGAINST THE DEBTORS TO MAKE REASONABLY INFORMED DECISIONS IN EXERCISING THEIR RIGHT TO VOTE ON THE PLAN.  APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT, HOWEVER, DOES NOT CONSTITUTE A DETERMINATION ON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS SUBMITTED HEREWITH ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN.  THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE CHAPTER 11 TRUSTEE FROM NUMEROUS SOURCES AND IS BELIEVED TO BE ACCURATE TO THE BEST OF THE CHAPTER 11 TRUSTEE'S KNOWLEDGE, INFORMATION AND BELIEF.  HOLDERS OF CLAIMS MUST RELY ON THEIR OWN EXAMINATION OF THE DEBTORS AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. BEFORE SUBMITTING

BALLOTS, HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THIS DISCLOSURE STATEMENT IN ITS ENTIRETY.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE CHAPTER 11 TRUSTEE, THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS. CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY THEIR NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

# I.   **INTRODUCTION**

On February 9, 2007 (the "Dwek Petition Date"), certain creditors of Solomon Dwek ("Dwek" or "Individual Debtor") filed an involuntary bankruptcy petition against him pursuant to Chapter 7 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code ") with the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court" or "Court") bearing Case No. 07-11757 (KCF) (the "Chapter 7 Case").

At Dwek's request, on February 22, 2007, the Court entered an order converting the Chapter 7 Case to a chapter 11 case (the "Dwek Chapter 11 Case").

Subsequent to the Dwek Petition Date, Dwek caused voluntary petitions to be filed on behalf of the Jointly Administered Debtors (the Individual Debtor and Jointly Administered Debtors are hereafter collectively referred to as the "Debtors" or Jointly Administered Debtors).[1]

---

[1] The jointly administered debtors include: Solomon Dwek, Case No. 07-11757 (KCF); 10 Neptune, LLC, Case No. 07-11974 (KCF); SEM Realty Associates LLC, Case No. 07-11976 (KCF); Deal Golf, LLC, Case No. 07-11982 (KCF); Dwek Trenton Gas, LLC Case No. 07-12794 (KCF); Neptune Gas, LLC, Case No. 07-12796 (KCF); Route 33 Medical, LLC, Case No. 07-12798 (KCF); 1111 Eleventh Avenue, LLC, Case No. 07-12799 (KCF); Dwek North Olden, LLC, Case No. 07-12800 (KCF); Dwek State College, LLC, Case No. 07-12802 (KCF); 1631 Highway 35, LLC, Case No. 07-16041 (KCF); 167 Monmouth Road, LLC, Case No. 07-16045 (KCF); 2100 Highway 35, LLC, Case No. 07-16048 (KCF); 230 Broadway, LLC, Case No. 07-16049 (KCF); 264 Highway 35, LLC, Case No. 07-16052 (KCF); 374 Monmouth Road, LLC, Case No. 07-16053 (KCF); 55 North Gilbert, LLC, Case No. 07-16054 (KCF); 601 Main Street, LLC, Case No. 07-16055 (KCF); 6201 Route 9, LLC, Case No. 07-16057 (KCF); Aberdeen Gas, LLC, Case No. 07-16058 (KCF); Bath Avenue Holdings, LLC, Case No. 07-16060 (KCF); Belmar Gas, LLC, Case No. 07-16061 (KCF); Berkeley Heights Gas, LLC, Case No. 07-16062 (KCF); Brick Gas, LLC, Case No. 07-16064 (KCF); Dover Estates, LLC, Case No. 07-16065 (KCF); Dwek Gas, LLC, Case No. 07-16066 (KCF); Dwek Hopatchung, LLC, Case No. 07-16067 (KCF); Dwek Income, LLC, Case No. 07-16068 (KCF); Dwek Ohio, LLC, Case No. 07-16069 (KCF); Dwek Pennsylvania, LP, Case No. 07-16071 (KCF); Dwek Wall, LLC, Case No. 07-16072 (KCF); Dwek Woodbridge, LLC, Case No. 07-16073 (KCF); Kadosh, LLC, Case No. 07-16074 (KCF); Lacey Land, LLC, Case No. 07-16075 (KCF); Monmouth Plaza, LLC, Case No. 07-16076 (KCF); P & Y Holdings, LLC, Case No. 07-16077 (KCF); Sugar Maple Estates, LLC, Case No. 07-16078 (KCF); West Bangs Avenue, LLC, Case No. 07-16079 (KCF); Beach Mart, LLC, Case No. 07-16104 (KCF); Seven Broad, LLC, Case No. 07-17124 (KCF); Dwek Apartments, LLC, Case No. 07-18315 (KCF); Dwek Raleigh, LLC, Case No. 07-18316 (KCF); Greenwood Plaza Acquisitions, LLC, Case No. 07-18317 (KCF); Sinking Springs II, LP, Case No. 07-18318 (KCF); Sinking Springs, LP, Case No. 07-18320 (KCF); Neptune Medical, LLC, Case No. 07-18766 (KCF); Bridgeton Building, LLC, Case No. 07-19629 (KCF); Dwek Properties, LLC, Case No. 07-20939 (KCF); WLB Center, LLC, Case No. 07-21752 (KCF); Dwek Branches, LLC, Case No. 07-22035 (KCF); Dwek Assets, LLC, Case No. 07-22036 (KCF); Asbury Gas, LLC, Case No. 07-22632 (KCF); Jemar Enterprises, LLC, Case No. 07-22633 (KCF); Melville Dwek, LLC, Case No. 07-22634 (KCF); Newport WLB, LLC, Case No. 07-22635 (KCF); Red Bank Gas, LLC, Case No. 07-22636 (KCF); WLB Highway, LLC, Case No. 07-22638 (KCF); Belmont Properties, LLC, Case No. 07-22898 (KCF); Tinton Falls Land, LLC, Case No. 07-23872 (KCF); Copper Gables, LLC, Case No. 07-24829 (KCF); Dwek Homes, LLC, Case No. 07-24832 (KCF); Myrtle Avenue Land, LLC, Case No. 07-24835 (KCF); Dwek Wall Gas, LLC, Case No. 07-24836 (KCF); Grant Avenue Estates, (continued...)

The Court thereafter entered orders consolidating for purposes of administration only the Jointly Administered Debtors case with the Dwek Chapter 11 Case (collectively the "Jointly Administered Cases" or "Chapter 11 Cases").

On March 2, 2007, the Bankruptcy Court entered an order appointing Charles A. Stanziale, Jr., Esq. as the Chapter 11 Trustee of the Dwek Chapter 11 Case (the "Chapter 11 Trustee" or "Trustee"). Thereafter, the Court approved motions filed by the Office of the United States Trustee in each of the Jointly Administered Cases appointing Charles A. Stanziale, Jr., as the Chapter 11 Trustee for each of the Jointly Administered Debtors.

Since the appointment of the Chapter 11 Trustee each of the Jointly Administered Debtors have remained out of possession of its assets and the Trustee has managed their businesses and financial affairs.

The Chapter 11 Trustee submits this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of votes to accept or reject his proposed Plan dated December 3, 2009, a copy of which is annexed hereto as Exhibit A.[2]

---

(…continued)
LLC, Case No. 07-24837 (KCF); Neptune City Stores, LLC, Case No. 07-24839 (KCF), 170 Broad, LLC, Case No. 07-24922 (KCF); Dwek Land, LLC, Case No. 07-25349 (KCF); Dwek Motors, LLC, Case No. 07-25350 (KCF); Waretown Shops, LLC, Case No. 07-25668 (KCF); Monmouth Consulting Services, LLC, Case No. 07-25913 (KCF); Monmouth Road Brokers, LLC, Case No. 07-27357 (KCF), Winston Circle, LLC, Case No. 08-15790 (KCF); Sinking Springs Outparcel, LP, Case No. 08-26159 (KCF); Deal Road Land Holdings, LLC, Case No. 08-26200 (KCF); Corbett Holdings I, LLC, 09-18421 (KCF); 1806 Holdings, LLC, 09-19901 (KCF); Corlies Avenue Land, LLC, 09-37142 (KCF); Little Silver Retail, LLC, 09-40968 (KCF); Ocean Circle Holdings, LLC, 09-40969 (KCF), Little Silver Gas, LLC (09-40970 (KCF); and 1400 Offices, LLC, 09-40971 (KCF).(the "Jointly Administered Debtors" or "Debtors").

[2]Unless otherwise defined, all capitalized terms contained in this Disclosure Statement have the meanings ascribed to them in the Plan.

**A.    Purpose of This Document**

This Disclosure Statement summarizes what is in the Plan, and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.

READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:

    (1)    WHO CAN VOTE OR OBJECT,

    (2)    THE PROPOSED TREATMENT OF YOUR CLAIM (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOU WOULD RECEIVE IN LIQUIDATION,

    (3)    THE HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING THE BANKRUPTCIES,

    (4)    WHAT THE COURT WILL CONSIDER WHEN DECIDING WHETHER TO CONFIRM THE PLAN,

    (5)    THE EFFECT OF CONFIRMATION, AND

    (6)    THE FEASIBILITY OF THE PLAN.

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own lawyer to obtain more specific advice on how this Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement.  If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

8

Code Section 1125 requires a Disclosure Statement to contain "adequate information" concerning the Plan. The term "adequate information" is defined in Code Section 1125(a) as "information of a kind, and in sufficient detail," about a debtor and its operations that would enable a "hypothetical investor" to make an informed judgment about accepting or rejecting the Plan. The Bankruptcy Court has determined that the information contained in this Disclosure Statement is adequate, and it has approved this document in accordance with Code Section 1124.

This Disclosure Statement is provided to each creditor whose claim has been scheduled by the Debtors or who has filed a proof of claim against the Debtors and to each interest holder of record as of the date of approval of this Disclosure Statement. Under the Bankruptcy Code, your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement prior to or concurrently with such solicitation.

**B.      Confirmation Procedures**

<u>Persons Potentially Eligible to Vote on the Plan</u>

In determining acceptance of the Plan, votes will only be counted if submitted by a creditor whose claim is duly scheduled by the Debtors as undisputed, non-contingent and unliquidated, or who, prior to the hearing on confirmation of the Plan, has filed with the Court a proof of claim which has not been objected to via motion or as part of a complaint or adversary proceeding, disallowed or suspended prior to computation of the votes on the Plan. All equity holders of record as of the date of approval of this Disclosure Statement may vote on the Plan. The Ballot Form that you received does not constitute a proof of claim. If you are uncertain whether your claim has been correctly scheduled, you should check the Debtors' Schedules, which are on file at the office of the Clerk of the Bankruptcy Court located at: United States

9

Bankruptcy Court, District of New Jersey, 402 East State Street, Trenton, New Jersey 08608. The Clerk of the Bankruptcy Court will not provide this information by telephone.

**THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTORS AND ON ALL CREDITORS AND INTEREST HOLDERS IN THESE CASES.**

1.      **Time and Place of the Confirmation Hearing**

The Bankruptcy Court has approved this Disclosure Statement as containing "adequate information" in accordance with Section 1125(b) of the Bankruptcy Code to enable a hypothetical, reasonable investor typical of the Voting Classes (as defined herein) contained in the Plan to make an informed judgment about whether to accept or reject the Plan.  The hearing at which the Court will determine whether to confirm the Plan will take place on _____, at _____ a.m., in Courtroom 2, before the Honorable Kathryn C. Ferguson, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of New Jersey, 402 East State Street, Third Floor, Trenton, New Jersey 08608.  At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements for confirmation under the Bankruptcy Code.

2.      **Deadline For Voting For or Against the Plan**

Voting instructions are contained in Article IV, Section B of this Disclosure Statement.  To be counted, your original Ballot must be duly completed, executed and filed with:

**McCARTER & ENGLISH, LLP**
Attention: Brian L. Baker, Esq.
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102

Your Ballot must be received at the address listed above by 5:00 p.m., Eastern Standard Time, on

_____, 2010.  If your Ballot is not timely received, it may not be counted in determining

whether the Plan has been accepted.  You are urged to carefully review the contents of the Plan

and Disclosure Statement, including all exhibits annexed thereto, before making your decision to

vote to accept or reject the Plan.  If your Claim is impaired (as defined in this Disclosure

Statement) by the Plan, you are entitled to vote to accept or reject the Plan.  Particular attention

should be directed to the provisions of the Plan affecting or impairing your rights as they may

presently exist.

      **3.**       **Deadline For Objecting to the Confirmation of the Plan**

          The Bankruptcy Court has directed that objections, if any, to confirmation of the

Plan must be filed and served so they are received on or before _____, 2010 at 5:00

p.m., Eastern Standard Time, in the manner described in Article IV, Section C of this Disclosure

Statement.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy

Court without further notice except for the announcement of the adjournment date made at the

Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.  Objections to the

confirmation of the Plan must be filed with the Court, United States Bankruptcy Court for the

District of New Jersey, 402 East State Street, Trenton, New Jersey 08608,  and served upon:

11

**McCARTER & ENGLISH, LLP**
Attention: Brian L. Baker, Esq.
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102

4.      **Identity of Person to Contact for More Information Regarding the Plan**

Any interested party desiring further information about the Plan should contact:

**McCARTER & ENGLISH, LLP**
Brian L. Baker, Esq.
Jeffery T. Testa, Esq.
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
Phone: (973) 622-4444
Facsimile: (973) 624-7070
Email: bbaker@mccarter.com

In addition to certain schedules, attached as Exhibits to this Disclosure Statement are copies of the following documents:

Exhibit A:      The Plan and any exhibits thereto;

Exhibit B:      Order of the Bankruptcy Court dated _____, 2010 (the "Disclosure Statement Order"), among other things, approving this Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan; and

Exhibit C:      Liquidation Analysis.

## II.    Description of the Debtors, Financial Entanglements and Reasons for the Debtors' Chapter 11 Filings

### A.    The Debtors

Since his appointment the Trustee and his professionals have investigated the Debtors' pre-bankruptcy activities and have formed certain conclusions based upon deposition testimony, document review, informal interviews and other disclosures.

At the request of the United States Attorney, the Court entered several orders prohibiting Dwek's examination.. Nevertheless, since the Petition Date, Dwek has cooperated with the Trustee and subjected himself to Federal Rule of Bankruptcy Procedure 341(a) meetings on behalf of the Debtors.  The Trustee offers the following description of the Debtors' activities based upon his investigation to date, the 341(a) meetings, his informal contact with Dwek and is based on his information and belief.

Dwek was a real estate investor who, in his own name, as the sole or controlling member of numerous limited liability companies, or as the minority member of numerous limited liability companies, had purchased land, residential, commercial, and industrial real property throughout New Jersey and various other states.  As of the Dwek Petition Date, Dwek individually, as sole member of the Debtors and as a member of the non-debtor partnerships owned more than 300 properties (collectively the "Properties").

As of the Dwek Petition Date, Dwek asserted that the Properties and his other assets were valued at approximately $400 million and his liabilities, inclusive of claims he disputes and/or regards as subject to reclassification or subordination, totaled approximately $350 million.

However, approximately $3.2 billion in claims have been filed against the Debtors (the "Total Claims").  Of the Total Claims, approximately $2.8 billion represents claims filed in the

SEM Realty Associates, LLC ("SEM") case and Dwek Chapter 11 Case. Of the approximate $2.8 billion of those claims, approximately $2.6 billion were filed in the Dwek Chapter 11 Case and approximately $165 million were filed in the SEM case. However, the total claims filed collectively against the Debtors' Estates *exclusive* of duplicate claims approximates $580 million, with $500 million being claims filed in the Dwek Chapter 11 Case and SEM case.

Dwek purchased, sold, developed, and invested in the Properties by forming various limited liability companies that include the Jointly Administered Debtors and non-debtor partnerships (the "Non-Debtor Partnerships") in which Dwek was, and in some cases remains, only a part member (collectively the "Dwek Holding Companies"). A list of the Non-Debtor Partnerships in which Dwek currently possesses an interest is attached hereto as Schedule 2.1. Some of the Dwek Holding Companies owned/own a single property while others owned multiple properties. As set forth in detail below, Dwek operated, and *nearly* every creditor and person that transacted business with Dwek treated, the Dwek Holding Companies as a single entity (the "Dwek Enterprise").

Dwek acquired his interests in most of the Properties primarily through the operation of a ponzi scheme (the "Ponzi Scheme"), but also used his relationship with certain bank officers, bank directors and bank employees, employed certain lawyers, and was aided by certain co-conspirators (collectively the "Ponzi Participants") who all through investments, loans and other activities collectively helped Dwek obtain and maintain the Properties so that Dwek could repay certain Ponzi Participants a return on their investment notwithstanding the Properties did not generate sufficient income to make all such payments and to support the debt service on the Properties.

14

The Ponzi Participants, certain unsecured lenders and wrap mortgagees were the sources Dwek used to acquire title to the Properties, but also used these monies to repay other Ponzi Participants (the "Ponzi Funding Sources"). Dwek also bought several Ponzi Participants' involvement and/or silence in the scheme by granting them interests in some of the Dwek Holding Companies, giving them cash, purchasing their homes, constructing/renovating their homes, and making charitable donations to organizations under their control.

As stated above, Dwek received investment funds from numerous individuals and entities (the "Investors") by promising a guaranteed return in a specified period of time. Virtually all of the Investors believed they were investing with Dwek personally without regard to the ultimate destination of the funds. In virtually every instance, however, the Investors wired or made their investment checks payable to the SEM Realty Associates, LLC, bank account located at PNC Bank, N.A (the "SEM Account").

In most instances, Dwek used the funds that he received from Ponzi Participants to repay other Investors, to purchase real estate, to service debt on the Properties owned by the Dwek Holding Companies, to donate to charitable religious organizations, to improve the Properties, and to fund operating shortfalls of the Dwek Holding Companies Properties (e.g., properties that did not generate sufficient income to cover carrying costs including, but not limited to, mortgage debt service, insurance, real estate taxes, maintenance fees, management fees, legal fees, engineering fees, and architectural fees).

In fact, the majority of the proceeds that he received from new Investors, unsecured lenders and wrap mortgagees was used to repay previous Investors their original investments plus significant fictitious profits. In the rare instance where Dwek confirmed the principal

15

investment in writing, he also confirmed the promised return and the date of the promised return. However, such confirmation did not provide specific information as to how the investment funds were to be used in order to obtain the fictitious profits.

In numerous instances, Investors received their principal investments and significant fictitious profits within months of their investments as promised. Some of the Investors received a return on their investment between approximately 20% and 45% within months of making their investment. These fictitious profits were at the expense of subsequent Investors, unsecured lenders and wrap mortgagees who were not repaid as of the Dwek Petition Date.

Dwek was able to raise money from new Investors by delivering false profits to earlier Investors and creating an illusion that he was a successful, philanthropic real estate mogul who delivered incomparable investment returns. In order to create the illusion that he was a philanthropist, Dwek donated millions of dollars of fraudulently obtained funds to religious and other organizations. Although a majority of the funds Dwek obtained from the Ponzi Scheme primarily benefited those Ponzi Participants who were repaid their investment with significant Profits, the Ponzi Scheme did allow Dwek to live very comfortably and gain prestige and status in the community as a philanthropic individual. The Ponzi Scheme also appears to have benefited the numerous lenders/banking institutions who were repaid their loan/investment with interest notwithstanding the property which secured such loans/investments did not generate any or sufficient income to satisfy such debt. Currently, there is no evidence that suggests Dwek has any cash or other assets not known to the Trustee.

Dwek also obtained unsecured loans from at least one individual banking professional and several financial institutions (the "Unsecured Lenders") based on Dwek's representations that Dwek was going to utilize the proceeds to, among other things, purchase real estate.

Dwek also obtained personal loans from financial institutions and other individuals and entities (the "Wrap Mortgagees") that were secured by second and third mortgages on properties owned by the Dwek Holding Companies. Dwek represented to the Wrap Mortgagees that the proceeds from the loans would be used to, among other things, purchase real properties or interests in real properties.

In almost every instance, Dwek personally guaranteed the debts owed to the Unsecured Lenders, the Wrap Mortgagees, and all of the legitimate purchase money mortgage debt. In fact, Dwek obtained virtually all of the Unsecured Lender debt, the Wrap Mortgagee debt and purchase money mortgage debt, by providing personal financial statements prepared by his accountant (the "Personal Financial Statements"). The Personal Financial Statements were accompanied by a letter prepared by his accountant. The letter stated that Dwek had elected to omit substantially all of the disclosures required by generally accepted accounting procedures. The letter cautioned each user that such omissions might influence their conclusions. Each of the Personal Financial Statements also attached schedules of those wholly owned limited liability companies with the properties owned by each and those partially owned limited liability companies with the properties owned by each. Dwek's accountants updated the Personal Financial Statements from time to time between December, 2002, and June 2005, having prepared a total of approximately five (5) such statements. Since nearly all of the various Debtor entities were formed at the time each acquired the purchased property, such Debtor entity had no

17

financial statement or past business dealings on which the Unsecured Lenders, Wrap Mortgagees or the purchase money mortgagees could rely. Instead, Dwek provided the Personal Financial Statements to induce these lenders to fulfill Dwek's funding or investment requests.

On some occasions, Dwek misrepresented to the Investors, Unsecured Lenders and Wrap Mortgagees that he had secured contracts to purchase certain real properties at a set price and had simultaneously secured contracts to sell those same properties to a fictitious third party at a set price. In most instances however, Investors, Unsecured Lenders and Wrap Mortgagees were not informed which properties were being acquired or maintained with the funds, or the source of the funds used to repay Investors, the Unsecured Lenders or the Wrap Mortgagees. The Ponzi Participants and Ponzi Funding Sources either turned a blind eye to the entire Dwek Enterprise which could have been discovered or relied on the financial strength of the Dwek Enterprise on a consolidated basis *prior* **to** funding. It is believed that the few Investors who actually did the most basic investigation or asked the most basic questions were able to determine the true nature of the Dwek Enterprise *before* funding and in some cases shortly after funding and who immediately demanded the return of their investment without any profit.

Prior to the appointment of the Fiscal Agent (defined below), with the exception of the limited purchase money mortgagees, virtually all of the money Dwek received since March of 2003 including funds received from the Investors, Unsecured Lenders and Wrap Mortgagees were deposited and commingled in the SEM Account, and were not devoted to a specific investment or property.

18

The sources of deposits into the SEM Account include, but were not limited to Unsecured Lenders, Wrap Mortgagees, Individual Ponzi Investors, Solomon Dwek and other Dwek Holding Companies.

For example, on or about December 22, 2005, BRT Realty Trust ("BRT") loaned Dwek personally $7 Million (the "BRT Loan"), but wired approximately $6.5 Million to the SEM Account.[3]    The $7 Million loan was given to Dwek personally, but was secured by a wrap mortgage (the "BRT Wrap Mortgage") on properties owned by various Dwek Holding Companies including Jemar Enterprises, LLC, Corbett Holdings I, LLC, 1111 Eleventh Avenue, LLC, Dwek Properties, LLC, Belmar Gas, LLC, Dwek Assets, LLC, Route 33 Medical, LLC, Waterview Offices, LLC, Dwek Apartments, LLC, WLB Highway, LLC, Berkeley Heights Gas, LLC, Myrtle Avenue Land, LLC and 170 Broad Street, LLC.    BRT filed duplicate claims in the amount of $6.0 million in six of the Debtors' Cases other than the SEM case.    BRT received payments on the BRT Loan directly from several of the Debtors who owned the properties encumbered by the BRT Wrap Mortgage and from the sale proceeds of the various properties upon which the BRT Wrap Mortgage encumbered even though such entities did not receive the benefit of the BRT Loan.

During the same period, $69 million of the SEM funds were used to purchase various properties owned by the Dwek Holding Companies, $222 million was used to repay Investors, and a total of $61 million was transferred to a Commerce Bank account in the name of Dwek Properties, LLC or directly to accounts of other Debtors.

---

[3] BRT charged Dwek approximately $500,000.00 in loan fees that were paid at loan inception.

19

Although most of the Debtors, including Dwek Properties, LLC, maintained its own discrete bank account, Dwek opened an additional Commerce Bank account, account number 6855741630 in the name of Dwek Properties, LLC (the "Commerce Account") which was a high volume bank account that acted as an expense account for Dwek personally and the Dwek Holding Companies. The primary source of funds deposited into this account were the transfers made from the SEM Account. During January 2005 through June 2006, a total of $56 million was deposited into the Commerce Account from the SEM Account.

Dwek used the Commerce Account to make some charitable donations, improve real estate, pay closing costs for the purchase of properties by other Debtors, pay mortgages and fund the operation shortfalls without regard to the separateness of the various Debtors.

Although the Commerce Account was in the name of one of the Debtors, Dwek Properties, LLC, and although most of the money that was deposited into the Commerce Account came from SEM, another Debtor, the Commerce Account was maintained by Amy Annecharico ("Annecharico"), an employee of the Deal Yeshiva and Dwek. There is no evidence any of the Debtors employed Annecharico or that any of the Debtors paid her a salary. It is believed but unverified that Dwek paid Annecharico $15,000.00 per year in a lump sum each December out of his personal account for such services. Also problematic is that some of the payments made from the Commerce Account to or for the benefit of the various other Dwek Holding Companies, including the Debtors, were not clearly recorded in the appropriate books and records of the benefiting Dwek Holding Company.

The Properties for the most part were managed by Capital Real Estate Management ("CREM"). With some exceptions, each Debtor maintained one cash account. The majority of

20

the entities did not generate sufficient cash flow to pay their obligations as they became due and required monthly infusions of cash. As funds were needed to sustain the entire entity (usually on a daily or weekly basis), CREM would prepare requisitions that were submitted to Dwek. Dwek would then transfer or cause to be transferred money from SEM to the Commerce Account and then from the Commerce Account to yet another Commerce Bank account held in the name of yet another Debtor, Monmouth Consulting Services, LLC (the "Monmouth Consulting Commerce Account") and then immediately transferred the requisite funds to the requesting Debtor. The Monmouth Consulting Commerce Account was used by Dwek and CREM as both a conduit for the other Dwek Holding Companies and was used as the Monmouth Consulting Services, LLC's operating account.

During the period January 1, 2004 through April 2006 a total of $7.1 million was deposited into the Monmouth Consulting Commerce Account. Of this amount $2.9 was transferred from the Commerce Account and $3.7 million received directly from the SEM Account. However, the books and records of Monmouth Consulting, LLC recorded the receipt of all funds from all sources as receipts from Solomon Dwek and not from SEM or Dwek Properties, LLC.

Moreover, there were no proper internal or external checks and balances on CREM or the outside accounting firm. Specifically, CREM prepared separate books and records for each of the Debtor entities. CREM also maintained all of the books and records for each entity. Additionally, the same outside accounting firm was used for each of the Debtors and complete audits or reviews to determine that the financial records were fairly stated were not done. Therefore, it would be a monumental undertaking at great expense to the Estates to verify the

accuracy of the voluminous number of transactions between the various Dwek Holding Companies.

**B.**    **Appointment of Fiscal Agent and the Further Effective Substantive Consolidation of the Jointly Administered Debtors Prior to the Dwek Petition Date**

After his appointment on May 16, 2006, the Fiscal Agent (defined below) seized control over all of the Dwek Holding Companies including the Jointly Administered Debtors' assets including the Properties and bank accounts (the "Seized Funds").

The Fiscal Agent operated the Dwek Holding Companies as a single entity and opened a single operating account at Commerce Bank (the "Fiscal Agent's Operating Account") which was used to pay the expenses of the all of the Dwek Holding Companies (including their mortgages, association dues, taxes, insurance, property repairs, etc.), fees and expenses of the Fiscal Agent and his retained professionals (which was submitted as a single consolidated bill for all of the Dwek Holding Companies), for appraisals of various Dwek Holding Companies' properties, and payment of Dwek's personal expenses.

Both prior to and after the appointment of the Fiscal Agent,  under the direction of Eric Phillips, CREM operated each of the Dwek Holding Companies as single contained units without regard to the specific properties owned by each.  In other words, excess monies generated from one property owned by a particular Debtor secured by a mortgage with one mortgagee was used to pay the expenses of another property owned by that same Debtor, but secured by a mortgage held by a different mortgagee.  Where a particular Dwek Holding Company was unable to satisfy the obligations of one or more of the properties it owned or the obligations of that Debtor, CREM would prepare requisitions to the Fiscal Agent requesting funds to cover such expenses of

22

those Debtors. The Fiscal Agent would then send the requested funds to the requesting Debtors account.

During the Fiscal Agent's tenure, Joseph Dwek ("Joseph"), the uncle of Dwek, and Joseph Dwek's company Yeshuah, LLC ("Yeshuah") asserted an ownership interest in numerous properties owned by various Dwek Holding Companies and 129 properties. For those properties, rather than forwarding the requisitions to the Fiscal Agent, such requests were made directly to Joseph/Yeshuah who in turn transferred monies to CREM to cover such expenses.

The Fiscal Agent's Operating Account was funded primarily from the Fiscal Agent's Trust Account (defined below), refund deposits, partnership buyouts, and the liquidation of Dwek's personal stock account. At the time of the Fiscal Agent's appointment, the SEM Account was overdrawn by approximately $19 Million, the Commerce Account had a zero balance and the Monmouth Consulting Commerce Account had an approximate $10,000.00 balance.

In addition to the Fiscal Agent's Operating Account, he also used a separate attorney trust account for all real estate transactions (the "Fiscal Agent's Trust Account"). It appears that the Fiscal Agent used the Fiscal Agent's Trust Account for the sole purpose of completing property sales for the various Dwek Holding Companies. During the Fiscal Agent's tenure approximately twenty-one (21) properties and four (4) partnership interests were liquidated and sold. These properties and interests were owned by approximately twenty-one (21) different Dwek Holding Companies. However, the proceeds from these sales were deposited and commingled in the Fiscal Agent's Trust Account and then transferred to the Fiscal Agent's Operating Account.

23

Upon information and belief, during the course of the State Court Action (defined below), the Fiscal Agent maintained the numerous Dwek properties through the use of funds generated by only some of the Properties. In other words, the debt (principal + interest), insurance, taxes, maintenance, professional fees, etc.., on numerous non-income producing properties for certain entities were serviced from monies generated from other Dwek entities with excess cash or from the net sales proceeds of properties sold by other Dwek Holding Companies by the Fiscal Agent.

After the appointment of the Fiscal Agent, the Fiscal Agent would send the requested funds directly to the entities. Additionally, the State Court entered an order that required Joseph Dwek and/or Yeshuah to fund any operating shortfalls for the properties owned and/or claimed to be owned directly or indirectly by Yeshuah.

As set forth above the Fiscal Agent similar to Dwek operated the Dwek Holding Companies as a single entity. Although the Fiscal Agent maintained a separate operating and trust account, monies from sales were commingled and used to pay the expenses of other entities and to pay the Fiscal Agent and his professionals on a consolidated basis.

## C.    Events Leading to and Reasons for the Chapter 11 Filings

### 1.    PNC Bank Check

On May 3, 2006, PNC Bank, a National Banking Association ("PNC"), filed a complaint (Docket No. C-133-06) in the New Jersey Superior Court, Chancery Division, Monmouth County (the "State Court"), against Dwek, SEM and Corbett Holdings, LLC (collectively, the "State Court Defendants") alleging among other things that on April 24, 2006, Dwek defrauded PNC when he presented a check in the amount of $25,212,076.35 for deposit into the SEM

24

Account drawn from another closed Dwek account at a PNC branch in Eatontown, New Jersey and fraudulently induced employees of PNC to accept the deposit based on Dwek's misrepresentations as to the status of the closed account and the incoming of a wire transfer in a sufficient amount to cover the deposit (the "PNC Complaint"). Thereafter Dwek transferred such monies in part to pay down an unsecured lender resulting in an overdraft of the SEM Account of $22,790,000.00 (the "State Court Action").

Also on May 3, 2006, the State Court granted PNC's Order to Show Cause for Temporary Restraining Order, Preliminary Injunction and Order of Attachment against the State Court Defendants, which among other things, enjoined Dwek and all the Dwek Holding Companies, including the Debtors, from transferring, assigning, misappropriating or converting any assets which they own or in which they may have an interest.

On May 16, 2006, the State Court granted PNC's Order to Show Cause for Appointment of Fiscal Agent, and appointed Donald M. Lomurro fiscal agent ("Fiscal Agent") of Dwek's assets and the assets of the Debtors.

### 2.    Criminal Complaint

On May 10, 2006, the Federal Bureau of Investigation (the "FBI") filed a criminal complaint against Dwek (the "Criminal Complaint") in the United States District Court for the District of New Jersey (the "Criminal Case"). The Criminal Complaint alleges, among other things, that Dwek's actions that precipitated the State Court Action violated title 18 of the United States Code Sections 1344 and 2.

On May 10, 2006 an arrest warrant was issued in the Criminal Case. Dwek was arrested on May 11, 2006 and bail was set at $10 million which was partially secured by his family

members' properties.   The Criminal Case is presently open and pending with "Orders to Continue" having been entered the last of which being entered on January 23, 2009.

According to the Criminal Complaint, Dwek was able to accomplish the allegations complained of by PNC in the PNC Complaint because Dwek misrepresented to PNC officials the true status of a closed account Dwek maintained with PNC under the name of Corbett Holdings II, LLC (the "Corbett Account").   The Criminal Complaint further alleges that Dwek presented a check drawn on the closed Corbett Account to deposit into the SEM Account.   It is further alleged that Dwek misrepresented that he expected a wire transfer into the Corbett Account that would cover the deposit into the SEM Account.

According to the PNC Complaint, Dwek had been and at the time of the filing of the PNC Complaint was currently a "long-standing banking customer of PNC, maintaining both personal and business accounts at PNC."   The Trustee believes that Dwek was able to accomplish the allegations complained of in both the PNC Complaint and the Criminal Complaint because of (1) his alleged misrepresentations to PNC, but also (2) his long standing relationship with PNC having multiple accounts with PNC that transacted hundreds of millions of dollars from their inception.   This allowed the misrepresentations made by Dwek to have more credibility because the money transacted by the Dwek Enterprise had been run in large part through PNC.

The allegations contained in the PNC Complaint and supported by the Trustee's investigation to date further reveal that Dwek may have made the alleged misrepresentations and may have made the $25 million deposit due to the threat of bodily harm by one of the largest Ponzi Participants and the threat of criminal prosecution by one of his largest institutional lenders.   Dwek was under extreme pressure to repay a certain obligation to this institutional

26

lender because such obligation was undertaken not only by Dwek, but also by this Ponzi Participant.  Thus, the majority of the money Dwek received from PNC was used to satisfy obligations owed by this Ponzi Participant and was made in furtherance of and consistent with the Ponzi Scheme.

### III.    THE CHAPTER 11 CASES

This section of the Disclosure Statement describes important developments that have occurred in the Chapter 11 Cases.

### A.    Commencement of Bankruptcy Proceeding

On February 9, 2007, three (3) of Dwek's creditors filed an involuntary bankruptcy petition against him pursuant to Chapter 7 of the Bankruptcy Code. On February 22, 2007, the Court entered an order converting the Chapter 7 Case to the Dwek Chapter 11 Case. Subsequent to the Dwek Petition Date, Dwek caused voluntary petitions to be filed on behalf of other Jointly Administered Debtors. A complete list of each of the Jointly Administered Debtors along with each bankruptcy filing date is attached hereto as Schedule 3.1.

### B.    Employment of Professionals

1.    **Trustee Professionals.** The Court has approved the Trustee's employment of the following professionals:

| Retained Professional | Scope of Retention | Date of Retention |
|---|---|---|
| McCarter & English, LLP | Counsel to Trustee | 12/4/08 |
| McElroy, Deutsch, Mulvaney & Carpenter, LLP | Counsel to Trustee | 3/27/07 |
| Gary Theodore, Esq., | Special Counsel to Trustee | 3/27/07 |
| Keen Realty | Real Estate Consultant to Trustee | 4/10/07 |
| Bederson & Company, LLP | Accountants to Trustee | 4/10/07 |
| Hochberg, Addeo & Polacco, LLC | Special Financial Consultant to Trustee | 5/2/07 |
| Greenberg Traurig LLP | Special Litigation Counsel to Trustee | 5/9/07 |

28

| Benchmark Appraisal, Inc. | Appraiser | 6/1/07 |
|---|---|---|
| Schonbraun McCann Group, LLP | Appraiser | 6/11/07 |
| G & G Realtors | Real Estate Broker | 7/3/07; 6/30/08 |
| McCarthy Appraisal Services, Inc | Appraiser | 9/26/07 |
| A. Atkins Appraisal Corp. | Appraiser | 10/19/07 |
| Caspert Management, Inc. | Auctioneer | 11/1/07 |
| Marc a/k/a Meir Lichtenstein | Special Real Estate Assistant to Keen | 3/18/08 |
| Stafford Smith Realty | Real Estate Broker | 8/26/08 |
| Peter H. Wegener, Esq. | Special Counsel to Trustee | 10/20/08 |
| Stern, Lavinthal, Frankenberg & Norgaard, LLC | Special Counsel to Trustee | 2/2/09 |
| Okin Hollander & DeLuca, L.L.P | Special Counsel to Trustee | 2/24/09 |
| Trenk, DiPasquale, Webster, Della Fera & Sodono, P.C. | Special Litigation Conflict Counsel | 2/26/09 |
| Valuation Consultants, Inc | Appraiser | 5/27/09 |
| Grant Thornton, LLP | Special Forensic Accountants | 9/23/09 |

In addition to the professionals retained above, on September 5, 2007, the Court entered a

consent order directing the Trustee to compensate Dwek in the amount of $15,000.00 per month

for a period of three months commencing June 8, 2007, for his services rendered to the Estates in

the form of virtual full time cooperation with the Trustee and the Trustee's professionals.

Payment, however, was conditioned on the Debtor's spouse, Pearl Dwek, conveying title to

certain properties that had been transferred to her or titled in her name consistent with the terms

of a separate consent order resolving claims the Trustee asserted against her.  On December 27,

29

2007, the Court entered a second consent order authorizing the Trustee to compensate Dwek

until further order of the Court commencing September 8, 2007 in the amount of $12,800.00 per

month plus reasonable expenses Dwek incurred in connection with his services to the Estates.

    2.    **Committee Professionals.**  On March 27, 2007, the United States Trustee for the

District of New Jersey (the "UST") appointed an Official Committee of Unsecured Creditors (the

"Committee") to represent the interests of the Debtors' unsecured creditors.  Upon its formation,

the Committee was comprised of individuals representing the following Creditors:  PNC Bank,

National Assoc., Charles O. Puth, Washington Mutual Bank, HSBC Bank USA, Amboy National

Bank, Charles Ishay, Ezra Grazi, Fleet Street, LTD, and AJH Investments, Inc.

    As a result of Committee members resigning and being replaced the current composition

of the Committee consists of  Charles O. Puth, HSBC Bank USA, Amboy National Bank,

Charles Ishay, Ezra Grazi, and Ezra Shalom.

    The Court has approved the Committee's employment of the following professionals:

| Retained Professional | Scope of Retention | Date of Retention |
|---|---|---|
| Duane Morris LLP | Counsel to Committee | 4/26/07 |
| Sobel & Co., LLC | Accountants to Committee | 4/25/07 |

    Since its formation, the Committee has played an active and involved role in all aspects

of the Jointly Administered Cases.

    3.    **Debtors' Professionals.**  The Court also approved the Debtors' employment of

the following professionals:

| Retained Professional | Scope of Retention | Date of Retention |
|---|---|---|

| Broege, Neumann, Fischer & Shaver, LLC | Counsel to the Debtors | 2/26/07 |
|---|---|---|

4.    **Fee Auditor.**  On June 27, 2008, the Court entered an Order appointing Warren

H. Smith & Associates, PC as the fee auditor in the Chapter 11 Cases (the "Fee Auditor").

**C.    Claims Process and Bar Dates**

1.    **Operating Guidelines**

Since his appointment, the Chapter 11 Trustee has followed the Operating Guidelines and

Reporting Requirements for Chapter 11 Cases (the "Operating Guidelines") promulgated by the

Office of the United States Trustee and has filed separate monthly operating reports for each of

the Debtors and has paid all quarterly fees due to the Office of the United States Trustee.

2.    **Section 341(a) Meeting of Creditors**

On March 29, 2007, Dwek appeared and provided testimony under oath at a section

341(a) meeting of creditors in the Chapter 11 Case conducted by the Trustee.

Thereafter, the Trustee conducted a separate section 341(a) meeting of creditors in each

of the Jointly Administered Cases.    Dwek appeared and provided testimony under oath at each

such meeting.

Dwek testified at several section 341(a) meetings as to his involvement and participation

in the Ponzi Scheme.

3.    **Schedules and Statements of Financial Affairs**

Dwek also caused Schedules and Statement of Financial Affairs which have also been

amended from time to time (collectively the "Schedules") for each of the Debtors to be filed with

31

the Bankruptcy Court. The Schedules can be reviewed on the Court's PACER system or at the Bankruptcy Court during regular business hours.

### 4.    Bar Date

The date by which Creditors had to file proofs of Claim in the Dwek Chapter 11 Case was June 27, 2007 (the "Claims Bar Date") and August 8, 2007, for the filing a proof of Claim by a Governmental Unit (the "Governmental Claims Bar Date"). The date by which Creditors and Governmental Units had to file proofs of Claim in each of the Jointly Administered Cases is listed on Schedule 3.1 attached hereto.

Any Holder of a Claim against the Debtors who was required to, but failed to file a proof of Claim on or before the Claims Bar Date or the Governmental Claims Bar Date, as applicable, will be challenged as untimely pursuant to the contemplated claims objection process and may be forever barred from asserting such a Claim against the Debtors' Estates.

### D.    Post-Petition Operations

Since his appointment the Trustee has conducted an aggressive investigation of the Debtors' pre-petition activities involving hundreds of millions of dollars in pre-petition transfers, partnership interests, and other fraudulent activities involving numerous persons, entities and banking institutions. The Committee has also conducted its own investigation into some of the Debtors' pre-petition activities and is believed to have shared all of its findings with the Trustee. Since his appointment, the Trustee has been in the process of marshalling and liquidating the Debtors' assets, securing the return of hundreds of properties from third-party transferees, conducting extensive investigations of the Debtors' pre-petition operations, gathering hundreds of thousands of documents relating to the Debtors' businesses, managing all the residential and

32

commercial properties, instituting numerous adversary proceedings, analyzing more than $1 billion in claims filed against the various Estates, and actively marketing, conducting regular auctions and selling the Properties.

E.    **Sale of Real Estate**

Shortly after his appointment and after consulting the Committee, the Trustee determined that the orderly liquidation of the Debtors' Properties would maximize the return to the creditors of the Estates. To assist the Trustee, he retained Keen Realty ("Keen") to market and help sell the Properties.

To further facilitate the efficient disposition of the Properties while maximizing their value, on September 18, 2007, the Trustee obtained an order from the Court Order Granting the Trustee's Motion (I) Establishing and Approving Bidding Procedures with Respect to the Sale of the Debtors' Real Property, (II) Approving the Form of Real Estate Agreement of Sale, (III) Limiting Service of the Notice of Auction & Sale Hearing, (IV) Approving a Sale Hearing Date Schedule and (V) Approving Procedure for Establishing Cure Amounts for certain Executory Contracts and Unexpired Leases (the "Order Granting the Bidding Procedures Order"). Since that time the Court has twice amended the Bidding Procedures Order on January 31, 2008 and again on August 20, 2008.

The sale of the Properties has been a massive undertaking. At the request of the Committee, the Trustee instructed Keen to solicit individual rather than any bulk offers for each of the Properties. As a result, each sale has required the negotiation of a sale contract, form of sale order, closing documents and other closing adjustments. As of December 2, 2009, the Trustee has obtained orders approving the sale of approximately 223 Properties, which

33

Properties were approved for sale at hearings conducted through September 30, 2009.   179
Properties have closed, inclusive of all approved sales through September 30, 2009, resulting in
the satisfaction of approximately $122,310,698.97 in secured  mortgage claims, approximately
$987,507.45 in priority real estate tax/sewer claims and the waiver of millions in potential
deficiency claims where such sales did not satisfy the lenders' full claims.   The sales of the
Properties to date have resulted in approximately $22,860,514.28 in net proceeds to the Estates
exclusive of costs and fees incurred by the Trustee's professionals and applicable Trustee
Commissions.

The Trustee estimates that as of September 30, 2009 there are approximately 42 unsold
Properties, exclusive of the five (5) properties owned by four (4) new jointly administered
debtors, with a fair market value of approximately $12,134,654.00, which has been determined
based on 50% of their average appraised values obtained by the Trustee approximately two (2)
years ago, less a three (3) percent realtor commission.  The Trustee further estimates that there
are approximately $11,083,015.00, in secured lien claims against the unsold Properties.

**F.**     **Motions for Relief from the Automatic Stay**

Section 362 of the Code prohibits the collection or continuation of certain actions against
the Debtors and their Assets.  Several creditors have sought and obtained orders granting relief
from the automatic stay to permit them to foreclose on some of the Properties upon which they
have asserted a mortgage lien (the "Stay Orders").   There are approximately 35 properties
subject to orders or agreements to stay relief (the "Stay Properties").

Notwithstanding the entry of the Stay Orders, the Trustee preserved his right to assert that
the asserted mortgage liens encumbering the Stay Properties were not valid liens and continued

34

to market and attempt to sell the Stay Properties after entry of the Stay Orders.  To the extent the

Trustee has been unable to sell the Stay Properties, the information contained in this Disclosure

Statement presumes that such Properties will not result in any equity to the Estates.  Attached as

Schedule 3.2 is a list of the Stay Properties and upon which such creditors may have or will

obtain foreclosure judgments.

**G.      Commencement of Litigation**

Shortly after his appointment and after consulting the Committee, the Trustee determined

to assert claims on behalf of the Debtors against the appropriate persons as revealed by the

Trustee's investigation under the applicable provisions of the Bankruptcy Code and applicable

non-bankruptcy law.  Generally, these claims include demands for the return of payments made

in the course of and in furtherance of the Ponzi Scheme including the return of payment of such

ponzi investors principal and profit, unpaid rents by tenants at the Properties, township held bond

escrows, deposits posted by Dwek for the purchase of additional properties, avoidance of

interests, contests to the extent, validity and priority of certain claims, tenant evictions, breach of

contract and other claims commenced and to be commenced by the Trustee in the Bankruptcy

Court and appropriate state court venue (collectively the "Litigation Claims").  A list of the

captions of all of the Litigation Claims commenced by, on behalf of or against the Trustee to date

is attached hereto as Schedule 3.3.

On February 2, 2009, the Trustee also obtained an order from the Bankruptcy Court

equitably tolling the statute of limitations to bring actions as the Trustee's ongoing investigation

may reveal.  The Trustee has separately entered into several tolling agreements with potential

defendants to permit the Trustee to further investigate and, if appropriate, assert additional

claims. Among the tolling agreements executed by the Trustee are separate agreements with Solomon Dwek and Pearl Dwek, his wife.

### 1.    Preferential Transfers

The Bankruptcy Code provides that any payments made by the Debtors to creditors within ninety (90) days and within one (1) year as to insiders may be subject to recovery by the Debtors. The Trustee continues to investigate potential preference and other causes of action as new entities are filed and consolidated with the Debtors.

### 2.    Projected Litigation Claims Recoveries

The Litigation Claims commenced to date assert quantifiable claims in excess of $250,000,000.00 million. The Litigation Claims commenced to date also seek to reclassify, reduce and expunge millions of claims asserted against the Estates. The Trustee believes that the Litigation Claims will result in a recovery of $15,000,000.00 to $75,000,000.00, but cautions that the outcome of litigation requires speculation in part and represents his educated good faith estimate.

### H.    Pearl Dwek Settlement

On August 8, 2007, the Court entered an Order approving a stipulation reached between the Trustee and Dwek's spouse, Pearl Dwek (the "Pearl Stipulation").

The Trustee asserted that Dwek had titled or transferred some of the Properties in Pearl Dwek's name for no or insufficient consideration. As a result of the negotiated resolution, the Trustee obtained the voluntary return of 41 properties to the Debtors and Non-Debtor Partnerships.

The Pearl Stipulation reserved all rights, claims, causes of action and defenses that the Trustee may have against Pearl Dwek and reserved all, rights, claims causes of action Pearl Dwek had against any of the Estates. Pearl Dwek, through her counsel, has put the Trustee on notice of claims she has against the Estates. These include a claim for a tax refund on her income, contents of a safe deposit box seized by the Trustee, ownership interests in approximately 70 properties, payment of family expenses, and other claims. The Trustee is in the preliminary phase of discussions with counsel to Pearl Dwek on the resolution of any claims on behalf of or against the Estates.

## I.    Joseph Dwek Settlement

On March 4, 2008, the Trustee filed an adversary proceeding against Joseph Dwek ("Joseph"), Yeshuah, LLC ("Yeshuah"), Joseph Dwek Family Limited Partnership ("Dwek LLP"), and Mark Adjmi ("Adjmi") (collective the "Joseph Defendants") in the United Stated Bankruptcy Court for the District of New Jersey, Adversary Proceeding No. 08-01209 (KCF) (the "Joseph Adversary Proceeding"), asserting claims generally of fraudulent transfer, common law fraud, conspiracy to commit fraud and related claims. The Trustee alleged, among other things, that prior to the Dwek Petition Date, on or about May 2, 2006, Dwek transferred to Yeshuah all his right, title and interest in one hundred and twenty-nine (129) real properties (the "Disputed Properties") and that Joseph and Yeshuah were Ponzi Participants having received approximately $67 million prior to the Dwek Petition Date.

On April 14, 2008, Joseph, Yeshuah, Dwek LLP, and Adjmi filed an answer, affirmative defenses and request for jury demand in the Adversary Proceeding. On April 14, 2008, Yeshuah filed a counterclaim against the Trustee in the Adversary Proceeding based on unjust enrichment

37

and seeking a constructive trust and declaratory judgment. Joseph and Yeshuah contended, among other things, that they were the proper owner of the Disputed Properties and that Joseph was owed $60 million as a result of investments made with Dwek.

After the appointment of the Fiscal Agent, Joseph and Yeshuah consented to the Fiscal Agent having managerial and financial control over all the Disputed Properties on a "without prejudice" basis during the pendency of the State Court action pursuant to a series of State Court orders negotiated among Joseph, Yeshuah and the Fiscal Agent.

Between May 16, 2006, and the Petition Date, the State Court entered several orders (the "Financing Orders") which provided, among other things, that any and all payments made by Joseph and/or Yeshuah to fund any operating shortfalls for the properties owned and/or claimed to be owned directly or indirectly by Yeshuah would be treated as "administrative expenses entitled to priority distribution pursuant to N.J.SA. 14A:14-21 and 11 U.S.C. §§ 503 and 507(a)(2)."

Joseph and/or Yeshuah advanced $1,473,350.00 between May 2, 2006, and the Dwek Petition Date pursuant to the Financing Orders, which funds were used by the Fiscal Agent and/or his agents to fund operating shortfalls for some or all of the Disputed Properties.

On February 2, 2009, the Court issued a bench ruling approving an agreement between the Trustee, the Joseph Defendants and HSBC Bank that was supported by the Committee and which settled the Joseph Adversary Proceeding (the "Joseph Settlement"). On February 12, 2009, the Court entered an order approving the Joseph Settlement. The Joseph Settlement contains four (4) major provisions. First, Joseph and Yeshuah relinquished and waived any claim, right, remedy or cause of action with respect to the ownership of the Transferred

38

Properties.  Second, Yeshuah was given an allowed administrative expense claim entitled to priority distribution pursuant to 11 U.S.C. §§ 503 and 507(a)(2), in the Dwek Chapter 11 Case in the amount of $1,484,757.20 for advances Yeshuah made to support the Transferred Properties to be paid on the earlier of:  (1) the effective date of a confirmed Chapter 11 plan in the Dwek Chapter 11 Case; or (2) the first date on which distributions are made to general unsecured creditors in the Dwek Chapter 11 Case.  Third, Joseph waived his contingent approximate $60 million claim against the Debtors and all other claims against the Debtors, and (4) HSBC reduced $43 million in claims (representing two (2) of four (4) loans Dwek had obligations on to HSBC) to a $20 million general unsecured claim in the Dwek Chapter 11 Case.[4]

**J.    Jubilee Settlement**

On May 29, 2008, the Trustee filed an Adversary against Issac Franco ("Franco") and Jubilee Limited Partnership ("Jubilee") seeking among other things the return of more than one hundred million dollars that was invested and repaid to Dwek during the course of the Ponzi Scheme (the "Franco Complaint").  The Franco Complaint  alleges among other matters that Franco and Jubilee knew or should have known about their participation in the Ponzi Scheme. On May 19, 2009, the Trustee on behalf of the estates obtained an order from the Bankruptcy

---

[4] In addition to the $20 million general unsecured claim HSBC shall also receive  in the event that the assets in the Dwek Chapter 11 Case, the SEM Bankruptcy estate and the Deal Golf Bankruptcy estate available for general unsecured creditors divided by the allowed general unsecured claims against those entities are greater than the assets in the Dwek Chapter 11 Case available for general unsecured creditors divided by the allowed general unsecured claims against the Dwek Chapter 11 Case, in each case without duplication, an additional general allowed unsecured claim against the Dwek Chapter 11 Case in an amount equal to one-half of the amount necessary for the total distribution to HSBC to equal the distribution that would have been made pursuant to a $20,000,000 general unsecured claim against those three estates if they were substantively consolidated.

Court that approved a settlement between the Trustee and Jubilee for the return of $6,000,000.00 which represented all of the profits earned plus approximately 10% of Jubilee's repaid principal investment. The Trustee retained all of his other claims and defenses against Franco.

**K.**     **Solomon Dwek Disclosed as Cooperating Witness in Government Political Corruption and Money Laundering Cases.**

On July 23, 2009, the United States Attorney filed 44 criminal complaints and made corresponding arrests of 44 individuals on political corruption and money laundering charges. It was later determined that Solomon Dwek was the government's key cooperating witness.

**L.**     **Solomon Dwek Guilty Pleas in Federal and State Court.**

On October 20, 2009, Dwek plead guilty in federal court to one count of bank fraud and one count of money laundering. On the same date he plead guilty to state charges of misconduct by a corporate official.

**M.**     **Trustee's Best Estimate of Summary of Present Assets and Liabilities on a Consolidated Basis[5]**

**A.**     **Assets**

**1.**    **Cash**

As of September 30, 2009, the Trustee had cash on hand in the approximate amount of $26,207,375.00. In addition, the Trustee believes that the United States Attorney's Office is holding approximately $487,900.00 that may be due to the Estates.

**2.**     **Litigation Claims**

---

[5] For a further explanation of the Assets and Liabilities the reader is encouraged to review the Liquidation Analysis attached hereto as Exhibit "C" and review Section IV(H)(1) below.

As of January 31, 2009, the Trustee has asserted claims against various individuals and entities seeking the return of several hundreds of millions dollars and the reduction, disallowance or subordination of millions of claims asserted against the Estates. While there is no way to state with any certainty the ultimate recovery, the Trustee estimates that the actual cash recovery from the Litigation Claims to be between $15,000,000.00 to $75,000,000.00, and the reduction and expungement of potentially $20,000,000.00 to $100,000,000.00 in claims asserted against the Estates.

**3.     Remaining Properties**

As of December 2, 2009, the Trustee has obtained orders approving the sale of approximately 223 Properties, which Properties were approved for sale at hearings conducted through September 30, 2009. 179 Properties have closed, inclusive of all approved sales through September 30, 2009, resulting in the satisfaction of approximately $122,310,698.97 in secured mortgage claims, approximately $987,507.45 in priority real estate tax/sewer claims and the waiver of millions in potential deficiency claims where such sales did not satisfy the lenders' full claims. The sales of the Properties to date have resulted in approximately $22,860,514.28 in net proceeds to the Estates exclusive of costs and fees incurred by the Trustee's professionals and applicable Trustee Commissions.

The Trustee estimates that as of September 30, 2009 there are approximately 42 unsold Properties, exclusive of the five (5) properties owned by four (4) new jointly administered debtors, with a fair market value of approximately $12,134,654.00, which has been determined based on 50% of their average appraised values obtained by the Trustee approximately two (2)

years ago, less a three (3) percent realtor commission.  The Trustee further estimates that there are approximately $11,083,015.00, in secured lien claims against the unsold Properties.

### 4.    Non-Debtor Partnership Interests

As of January 31, 2009, the Trustee believes Dwek has interests in approximately 28 non-debtor partnerships with an estimate value  in the approximate amount of $5,532,486.00 (the "Non-Debtor Partnerships").

### 5.    Note Receivable

The Debtors hold a balloon note that is due April 1, 2016 and is payable without interest in the amount of $4,500,000.00.

### 6.    Miscellaneous Assets

The Debtors may hold additional miscellaneous Assets with a value of less than $100,000.00 including a personal injury claim Dwek has asserted with a value believed to be between $10,000.00 and $30,000.00.

### B.    Liabilities

Administrative Claims: On the Confirmation Date, the Trustee anticipates Administrative Expense Claims, exclusive of quarterly fees, other statutory fees, and other Allowed Administrative Claims to total approximately $5,631,741.00.

Secured Claims: Liens encumbering the Approved Properties and Unsold Properties are estimated to be approximately $30,353,020.00.

Priority Gap Claims: On the Confirmation Date, the Trustee estimates that Priority Gap Claims will total approximately $9,223.00.

42

Priority Tax Claims: On the Confirmation Date, the Trustee anticipates Priority Tax Claims to total approximately $4,889,202.00.

General Unsecured Claims: The estimated general unsecured claims filed and scheduled against the Debtors exclusive of duplicates, amended and other disputed claims approximates $128,081,197.

Non-dischargeability Judgments: On July 5, 2007, Solomon Dwek consented to the entry of a judgment of non-dischargeability in favor of Charles Ishay ("Ishay") in the amount of $5,000,000.00 (the "Non-Dischargeability Judgment").[6]

### C.    Continued Liquidation Process

On a going forward basis, the Trustee will continue with the liquidation process including (1) sale of the remaining Unsold Properties; (2) closing the Approved Properties; (3) liquidation of the Non-Debtor Partnership Interests; (4) prosecution of the Litigation Claims; and (5) claims objections.

### IV.    SUMMARY OF THE PLAN

The following is a brief summary of certain provisions of the Plan. This summary does not purport to be complete, and Creditors are urged to read the Plan in full. A copy of the Plan is annexed hereto as Exhibit A.

---

[6] The Non-Dischargability Judgment also entitles Ishay to interest from April 12, 2006. The Trustee believes that Ishay is an unsecured creditor and shall receive distributions as set forth in the Plan as a Class 3 creditor without interest and consistent with the terms of the Good Faith Investor Settlement.

A.    **Introduction**

Pursuant to the Plan, the Trustee proposes an orderly liquidation of the Debtors' remaining Assets.  The Plan provides that the proceeds from the liquidation of the Debtors' Assets will be distributed to Creditors in accordance with the distributive provisions and priority scheme of the Bankruptcy Code.  The Plan will be implemented by establishing a Liquidating Trust that will be administered by the Liquidating Trustee.  On the Effective Date, the Debtors' Assets that are not otherwise distributed pursuant to the Plan will be transferred to the Liquidating Trust for the benefit of Creditors.  Thereafter, the Liquidating Trustee will be responsible for liquidating the Debtors' remaining Assets and making distributions to Creditors in accordance with the terms of the Plan.

B.    **Voting Procedures and Requirements**

1.    **Ballots and Voting Deadlines**

Accompanying this Disclosure Statement is a Ballot for acceptance or rejection of the Plan.  Your Claims may be classified in multiple classes.  When you vote and return your Ballot, please indicate the Class or Classes in which your Claims are classified by marking the appropriate space provided on your Ballot for such purpose.

**The Bankruptcy Court has directed that, to be counted for voting purposes, Ballots for the acceptance or rejection of the Plan must be filed with McCarter & English, LLP Attention: Brian L. Baker, Esq., Four Gateway Center,  100 Mulberry Street, Newark, New Jersey 07102  by no later than 5:00 p.m. Eastern Standard Time on _____, 2010 (the "Voting Deadline").**

Ballots not received by the Voting Deadline may not be counted, and Ballots that do not indicate either an acceptance or rejection of the Plan will be deemed to constitute an acceptance of the Plan.

If you have any questions regarding the procedure for voting, please contact:

> McCARTER & ENGLISH, LLP
> Attention: Brian L. Baker, Esq.
> Four Gateway Center
> 100 Mulberry Street
> Newark, New Jersey 07102
> Tel # (973) 622-4444
> Fax # (973) 624-7070
> Email: bbaker@mccarter.com

It is important for all Creditors that are entitled to vote on the Plan to exercise their right to vote to accept or reject the Plan. Even if you do not vote to accept the Plan, you may be bound by the Plan if it is accepted by the requisite Holders of Claims and confirmed by the Bankruptcy Court.

### 2.    Parties in Interest Entitled to Vote

Any Holder of a Claim against the Debtor whose Claim has not been Disallowed previously by the Bankruptcy Court, is entitled to vote to accept or reject the Plan if such Claim is impaired under the Plan and either (a) such Holder's Claim has been scheduled by the Debtor and is not scheduled as disputed, contingent or unliquidated, or (b) such Holder has filed a proof of Claim before the Bar Date, unless the Trustee has objected to such **Claim whether by motion or adversary complaint, is not entitled to vote unless the Bankruptcy Court, upon application by the Holder to whose Claim an objection has been made, temporarily allows such Claim in an amount that it deems proper for the purpose of accepting or rejecting the Plan or the Trustee otherwise consents in writing.** Any such application must be heard and determined by the Bankruptcy Court on or before the Voting Deadline. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was

45

not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy

Code.

### 3.    Voting Assumptions

**IN CONTEMPLATING TO VOTE FOR OR AGAINST THE PLAN, THOSE PARTIES ENTITLED TO VOTE MUST DO SO ON THE PREMISE THAT THE ESTATES ARE SUBSTANTIVELY CONSOLIDATED INTO ONE ESTATE. THEREFORE, THOSE PARTIES WITH ONE CLAIM AGAINST MULTIPLE DEBTORS MAY VOTE SUCH CLAIM ONE TIME ONLY.**

### 4.    Definition of Impairment

Pursuant to section 1124 of the Bankruptcy Code, a class of claims or equity interests is

impaired under a plan of reorganization unless, with respect to each claim or equity interest of

such class, the plan:

(1)    leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or interest; or

(2)    notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default:

- cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code;

- reinstates the maturity of such claim or interest as it existed before such default;

- compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law;

- if such claim or such interests arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for actual pecuniary loss incurred by such holder as a result of such failure; and

- does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

5.      **Classes Impaired under the Plan**

The Claims in Class 1 (Secured Claims) will be paid in full from funds already received and not from a distribution from the Liquidation Trust on the Effective Date or when Allowed and, therefore, are deemed to accept the Plan and thus not entitled to vote.

The Claims in Class 2 (Priority Non-Tax Claims) will be paid in full on the Effective Date of the Plan and, therefore, are deemed to accept the Plan and thus not entitled to vote.

The Claims in Class 3 (General Unsecured Claims) are impaired and are entitled to vote to accept or reject the Plan.

The Claims in Class 4 ( Subordinated Claims) are impaired and are entitled to vote to the extent permitted by the Court.

Class 5 (Equity Interests) is impaired.  No distributions will be made on account of Equity Interests.  Therefore, Class 5 is conclusively presumed to have rejected the Plan, and Holders of Class 5 Equity Interests are not entitled to vote to accept or reject the Plan.

C.      **Confirmation Procedure**

1.      **Confirmation Hearing**

A hearing before the Honorable Kathryn C. Ferguson, United States Bankruptcy Judge, has been scheduled for _____, 2010, at ___:___ __.m., at the United States Bankruptcy Court, 402 East State Street, Third Floor, Trenton, New Jersey 08608, to consider confirmation of the Plan.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

47

### 2.    Procedure for Objections

Any objection to confirmation of the Plan must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector.  Any such objection must be filed with the Bankruptcy Court and served on counsel for the Trustee and counsel for the Committee and all parties who have filed a notice of appearance by 5:00 p.m. Eastern Standard Time on _____, 2010.  Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court.

### 3.    Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if it meets all the requirements of Section 1129 of the Bankruptcy Code.  Among the requirements for confirmation are that the Plan be:  (a) accepted by all impaired classes of Claims and Equity Interests that are entitled to vote or, if rejected by an impaired class, that the Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to such class; (b) feasible; and (c) in the "best interests" of creditors and stockholders impaired under the Plan.  The Bankruptcy Court also must find that:

- The Plan has classified Claims and Equity Interests in a permissible manner;

- The Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and

- The Plan has been proposed in good faith.

### 4.    Classification of Claims and Interests

Section 1122 of the Bankruptcy Code requires the Plan to place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such class.  The Plan creates separate classes to deal

48

respectively with secured claims, unsecured claims and equity interests. The Chapter 11 Trustee believes the Plan's classifications place substantially similar Claims or Equity Interests in the same class and, thus, meet the requirements of section 1122 of the Bankruptcy Code.

### 5.    **Voting and Acceptance of the Plan**

As a condition to confirmation of the Plan, the Bankruptcy Code requires each class of "impaired" Claims or Equity Interests entitled to vote on the Plan to vote to accept the Plan. The Bankruptcy Code defines acceptance of a plan by a class of Creditors as acceptance by holders of two-thirds (2/3) in dollar amount and more than one-half (½) in number of those claims actually voting. Acceptance of the plan by a class of equity interests is defined as acceptance by holders of two-thirds (2/3) of the number of shares actually voting. Holders of Claims who fail to vote will not be counted as either accepting or rejecting the Plan. A vote, moreover, may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that it was not made or solicited in good faith.

Classes of claims or equity interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Classes of claims or equity interests that receive no distribution under a plan are conclusively presumed to have rejected the plan and are not entitled to vote.

### 6.    **Best Interests Test**

The "best interests" of creditors test requires that each Holder of a Claim or Equity Interest receive or retain under the Plan property of a value that is not less than the value such Holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. To determine what members of each impaired Class of Claims and Equity Interests would

49