| |
|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**FOR THE DISTRICT OF NEW JERSEY**<br>**Caption in compliance with D.N.J. LBR 9004-2(c)**<br><br>**McCARTER & ENGLISH, LLP**<br>Charles A. Stanziale, Jr.<br>Four Gateway Center<br>100 Mulberry Street<br>Newark, New Jersey 07102<br>Telephone: (973) 622-4444<br>Facsimile: (973) 624-7070<br><br>*Liquidation Trustee*<br><br>In Re:<br><br>**SOLOMON DWEK,**<br><br>Confirmed Debtor. |

Case No.: 07-11757 (KCF)

Chapter 11

Judge: Kathryn C. Ferguson

**SUPPLEMENTAL CERTIFICATION OF THE TRUSTEE, CHARLES A. STANZIALE, JR., IN RESPONSE TO ORDER TO SHOW CAUSE**

Charles A. Stanziale, Jr., certifies as follows:

1. I am the Liquidating Trustee (the "**Trustee**") of the Solomon Dwek Creditors Liquidation Trust (the "**Liquidation Trust**"), the successor in interest to the consolidated bankruptcy estates of Solomon Dwek ("**Dwek**") for which I was the chapter 11 Trustee.

2. I submit this Supplemental Certification in Response to the Court's April 28, 2010, Order to Show Cause why Dwek and/or the Trustee should not be ordered to disgorge expenses paid by the Trustee to Dwek (the "**OSC**").

3. On July 12, 2010, the Court conducted a hearing on the Trustee's response to the Court's OSC. The Court found the response to be inadequate and requested greater clarification and detail of out of pocket expenses paid as reimbursement to Solomon Dwek by the Estates.

**Payments Made to Dwek**

4. Attached as Exhibit "A" is a schedule of all payments I made to Dwek during the Chapter 11 proceedings (the "**Dwek Payments**") commencing June 2007 through April, 2010 (the "**34 Month Compensation Period**").

5. The Dwek Payments consist of (i) Dwek's Living Expense Payments (the "**Monthly Stipend**"), (ii) Dwek's Expense Reimbursements (the "**Expense Reimbursements**"), and (iii) reimbursement to Dwek for his Security Expenses (the "**Security Expenses**").

**Monthly Stipend**

6. Although I believe the OSC requests a detailed accounting of the Dwek Expense Reimbursements and the Payment of the Security Expenses, I am also providing a breakdown of the Monthly Stipend which is, in effect, compensation for his work in aid of the Estate's, as well. The Monthly Stipend during the 34 Month Compensation Period total $454,109.86. The Monthly Stipend was negotiated between Dwek and the creditors and agreed to by me and initially provided for a $12,800.00 payment. Subsequently, in an effort to reduce expenses I negotiated to lower the Monthly Stipend from $12,800 to $10,000 per month.

7. Exhibit "A" contains the breakdown by month of the amount and date of each Monthly Stipend. As required by Court order Dwek provided to me a combined spreadsheet detailing all of his living expenses which were not reimbursed and expenses incurred on behalf of or in connection with his assistance to the Estates along with receipts which support each item on the spreadsheet (the "**Supporting Documentation**"). The monthly spreadsheet contained personal expenses not reimbursable, but was provided to me as required by the Court Orders to justify the continued payment of the Monthly Stipend.

**Expense Reimbursements and Security Expenses**

8. The Dwek Expense Reimbursements consist of the following: (i) reimbursement of expenses Dwek incurred as a direct result of his assistance and participation in the Estates' efforts to liquidate assets and pursue litigation (the "**Estate Assistance Expenses**"); (ii) reimbursement of expenses Dwek incurred that benefited the Estates (the "**Estate Benefited Expenses**"); and (iii) pass through expenses not paid from Estate funds (the "**Pass-Through Expenses**"). As set forth on Exhibit "A" the Expense Reimbursements for the 34 Month Compensation Period total $680,185.30.

9. The *Estate Assistance Expenses* are those non-security actual expenses Dwek incurred to attend meetings, depositions, review documents, assist in the preparation of pleadings, etc., and include, but are not limited to automobile expenses, gas, tolls, parking, computer related services, telephone, office supplies.

10. The *Estate Benefited Expenses* are those non-security actual expenses Dwek paid and was reimbursed by the Estate that benefited Estates that include, but are not limited to insurance for real property which was vacant and prohibitively expensive for the Estate to cancel and repurchase; insurance, maintenance and repair work for automobiles owned by the Estates; certain utility obligations which otherwise would have required a high deposit to cancel and reapply, emergent landscaping and repairs for a handful of real properties.

11. The *Pass-Through Expenses* are those expenses for which the Estates received funds that should have otherwise been paid to Dwek or his family directly or where Dwek received checks for reimbursement of personal expense (such as school busing from municipality) and turned over check to Estate and the Estate wrote a check back to Dwek.

12. In late July 2009, it was reported that Dwek was a cooperating witness in connection with the arrest by the Federal Bureau of Investigation and the prosecution by the United States Attorney of 44 individuals. As a result, Dwek became the target of verified threats. Upon information and belief, the FBI and/or United States Attorney provided the Court with an affidavit detailing some of those threats.

13. Specific instances of valid threats on Dwek's life were given to me by Dwek's security detail who are former FBI agents and by Dwek. There was no question in my mind that Dwek's life was in jeopardy. He was in an undisclosed location and his travel patterns were constantly altered. Accordingly, in August of 2009, I met with Dwek and members of his security detail. As a result of these discussions I agreed to reimburse Dwek the expenses he incurred to these individuals who he retained for providing him security solely in connection with his assistance to me or on behalf of the Estates. As previously stated, I believed the Court's Orders authorized the reimbursement of expenses Dwek incurred in connection with his assistance and believed that the Security Expenses fell within the parameters of those orders. I believed the Security Expenses were reasonable and necessary expenses given the unique circumstances. Again, the option to have Dwek's security paid by the Estate was prompted by the fact that I was made to understand that the government was prepared to place Dwek and his family in the witness protection program and he would be available only for criminal trials. Conversely, it was made clear by me to Dwek, the security and the government that the security expense paid by the estate would only relate to Dwek's continued cooperation in the bankruptcy litigation and administration and the expense would not apply to his operating with the government in any way. Without Dwek's availability the Estate's recovery would have been reduced and 30 months of litigation would have been jeopardized by the fact that one of the

Estates' key witnesses would not be produced when needed for trial preparation and testimony for discovery and trial.

14. Since August 2009, when Dwek required security, I have scrutinized each invoice submitted by Dwek for security reimbursement I did everything possible to limit the Security Expenses. I demanded that the detail be reduced from two persons to one person. I requested that when my professionals required access to Dwek to do so where appropriate by telephone and to coordinate scheduling to avoid unnecessary appearances.

15. As previously stated, in addition to his Monthly Stipend, I reimbursed Dwek during the 34 Month Compensation Period, the costs he incurred in assisting me while I administered the 81 Debtor Estates in the amount of $680,185.30. Although Exhibit "A" shows this amount broken down by month, attached as Exhibit "B" is a more detailed schedule showing item by item by month of each expense that was reimbursed which is what I believe in good faith is what the Court has requested. Exhibit "B" is filed under seal due to the detailed nature of the document. Dwek provided me with a receipt to support each item on each schedule and I looked at each receipt and when necessary questioned the need for the items on the receipts. In the instances where I was not satisfied I did not reimburse Dwek for that item.

16. The reason the costs reimbursed to Dwek amount to $680,185.30 plus $404,146.63 in security expenses is because Dwek spent significant time on behalf of Estate business. Attached as Exhibit "C" are the detailed time charges of many, but not all, of the Chapter 11 Professionals indicating the time spent with Dwek.[1] As set forth in Exhibit "C",

---

[1] Exhibit "C" represents my good faith attempt to capture as much of Dwek's time as possible spent in assisting the administration of the Estates. Dwek had significant additional time spent with other professionals, prospective purchasers and other persons on behalf of and which benefited the Estates, but which are not reflected in Exhibit "C".

during the 34 Month Compensation Period, Dwek had approximately three thousand five hundred and sixty-seven (3,567) emails, letters and telephone exchanges with me and many of the professionals amounting to approximately five hundred and forty (540) working hours. Additionally as set forth on Exhibit "C", Dwek had approximately two hundred and seventy-three (273) meetings with me and many of the professionals amounting to approximately four hundred and sixty-two (462) working hours.

### Benefits to the Estates

17. The decision to compensate Dwek did not come without serious thought. I agreed to do so only after Dwek, through counsel, filed three (3) motions for compensation and only after parties in interest and the Committee agreed. I supported compensation to Dwek and to reimburse his costs in assisting the Estates given the significant amount of time and value Dwek had expended up to that point and the time that was anticipated he would have to devote going forward. The time Dwek ultimately spent on Estate business is set forth, in large part, above. Most importantly, however, is that I agreed to compensate Dwek and pay for his expenses because many of the claims of the Estates could not be determined through the review of documents alone or depositions of third parties or other means of investigation.

18. I continued to believe the amount paid to Dwek in the form of the Monthly Stipend as well as the cost to the Estates in connection with reimbursing Dwek his expenses in assisting the Estates have been paid for many times over as a result of his cooperation. The benefits of his cooperation include but are not limited to:

A. Recovery of $973,500.00 in cash that was held by Barry Kantrowitz ("**Kantrowitz**"). While Dwek did not inform me that Kantrowitz was holding this cash because at the time Dwek was a confidential cooperating witness for the government, Dwek consulted

with me in connection with my ongoing discussions with Kantrowitz over the resolution of claims I asserted on behalf of the Estates against Kantrowitz. Dwek was adamant that I not settle with Kantrowitz because there were "undisclosed additional claims" which Kantrowitz was not disclosing. It was only after I refused to settle with Kantrowitz until he "came clean" and turned this money over. The Kantrowitz case is not resolved but this turnover of the cash could not have happened but for Dwek's cooperation.

B.    Dwek additionally disclosed to me that he promised Kantrowitz interests in partnerships for no legitimate consideration, but rather in exchange for his bribing of public officials on Dwek's behalf and Kantrowitz's participation in numerous frauds against third parties and other claims for monies owed by Kantrowitz to the Estates. As a result, I am prosecuting claims against Kantrowitz seeking a determination he has no interest in these partnerships or a voidable interest and for the recovery of significant dollars. These were not facts that would have been discovered but for Dwek's cooperation and dedication of hours of time being questioned about these matters.

C.    The settlement, in principal, of significant claims against a certain law firm in connection with its role as Dwek's counsel prior to petition filing. As a result of statements verified by Dwek, a draft complaint and certain allegations were able to be presented to the potential defendant. Without Dwek's cooperation the Trustee believes proving the allegations against that potential defendant would have been costly. As a result, the settlement will yield between $450,000.00 and $500,000.00 in cash to the Estates and the realization of additional equity in certain non-debtor partnerships and a claim waiver.

D.    Although an investigation into Dwek's pre-petition business affairs and transactions in any event would likely have revealed a Ponzi Scheme, the recoveries to date

would not likely have been realized without Dwek's cooperation. Dwek provided the road map of the Ponzi scheme. Dwek's assistance saved hours of forensic accounting and legal time and expense pairing transferees and tracing funds. As means of an example according to the documents there may have been several recipients of transfers. Dwek was able to tell me and my counsel that all three recipients were in fact the same investor. Additionally, Dwek was able to provide the factual background with respect to each investor, and pointed to what evidence existed to show such investors acted in bad faith or should have known he was conducting a fraudulent scheme. Dwek was able to tell me of certain long term relationships he had with some of the investors which directly impacts the investor litigation. For example, while the documents may show that an investor dealt with Dwek on one or two occasions with regard to certain properties, Dwek disclosed other business and personal relationships with these investors that obliterate their good faith transferee defense by showing their complicity with Dwek in money laundering schemes. These are facts that may not have been discovered but for Dwek's cooperation. Due in part to Dwek's cooperation, significant settlements to date include:

(i)    $1.7 million from Isaac Franco. According to documentation Mr. Franco was owed approximately $9 million dollars. However, as a direct result of Dwek's cooperation as more particularly set forth in the complaint and settlement papers, Mr. Franco agreed to subordinate his approximate $9 million claim and paid the Estates approximately $1.7 million. Substantial costs litigating this matter were saved.

(ii)    Jubilee Limited Partnership $6 million. Jubilee and Isaac Franco invested significant sums together with Dwek. A settlement with Jubilee resulted in the return of $6 million dollars which consisted of the return of all of the profit it made plus $2,355,000 of its repaid principal investment. Dwek played an integral role in providing the facts and background

that provided the leverage for me in these settlement negotiations. For example, Dwek alleged that Jubilee attempted to record certain deeds Dwek falsified in connection with Jubilee's post investment attempt to secure its position. These facts helped me assert that at the time Jubilee was repaid its investment along with its profit it knew of Dwek's fraudulent scheme and therefore, could not assert the good faith transferee defense. Dwek's revelation of these facts brought Jubliee to the table.

(iii)     Other Investor Recoveries/Claims. As a result of Dwek's consistent testimony and cooperation, I have successfully settled and recovered several investor cases that include: Allen & Shelly Franco $455,000.00; Ben Harary $20,000.00; Daniel Massry $450,000.00; Eli Gindi $420,000.00; Nathan Shamosh $77,000.00; Sam Salem & Son, LLC $75,000.00; and Al Neil, LLP $106,000.00.

(iv)     Future Investor and other Litigation Recoveries. Dwek's review of every complaint for accuracy, his verification of the facts set forth in over 100 complaints, his continued cooperation, his willingness and ability to appear for depositions and consult on settlement negotiations I believe will assist in the recovery sought from the remaining litigation. The demand amounts on the remaining litigation exceed tens of millions of dollars.

E.     Property of the Estate held by the United States Attorney/FBI. The government is presently holding approximately $487,900.00 that belongs to the Estates. This money may not have discovered but for Dwek's assistance.

F.     Sun Bank v. Joseph Dwek. Maintaining security and payment of Dwek's expenses allowed him to testify at trials that have benefited the Estates. As a result of Dwek's cooperation Sun Bank's approximate $1,800,000.00 claim was extinguished by helping establish Sun Bank had a valid mortgage against Joseph Dwek's residence. Although Joseph Dwek now

asserts a $1 million dollar claim against the Estates for this mortgage[2], the claim amount is reduced. It is further anticipated that Dwek's continued cooperation and truthful testimony will help expunge this claim as well.

      G.      <u>Amboy Bank Settlement</u>.  This settlement was complex in its terms.  Dwek spent numerous days providing background information that assisted my counsel in preparation of a voluminous complaint against Amboy Bank and its president George Scharpf.  Ultimately Dwek verified the Complaint and provided certain facts that resulted in the reduction/subordination of a significant portion of the claims asserted by Amboy Bank and related parties.

      H.      <u>Four Star Builders Settlement</u>.  Four Star filed claims in excess of $2 million dollars.  As a result of Dwek's review of the asserted claims and other testimony he was prepared to give, I was able to obtain a settlement with Four Star that paid them $30,000.00 but waived all of its claims against the Estates.

      I.      <u>Joseph Dwek Settlement</u>.  Dwek provided facts of the events that surrounded the transfer of more than 100 of his properties to his uncle Joseph Dwek.  Although the transfer of these properties would have been discovered and likely voided, I was able to reach a global resolution with Joseph Dwek that not only returned these properties but also the waiver of what was approximately more than $40 million in claims Joseph Dwek potentially had against the Estates.  Dwek played an integral role in providing leverage in these negotiations and illuminated the events that occurred immediately prior to the transactions which would not have been discovered from a review of the documents alone.

---

[2] Joseph Dwek is not asserting the full amount of the Sun obligation because his contingent claim against the estate arising out of this transaction and litigation was specifically preserved, but capped at $1 million.

J.     <u>Eliahu Ben Haim</u>. Dwek alerted me to the fact that Eliahu Ben Haim, one of the Ponzi defendants, was charged with certain criminal acts and had been arrested by the FBI had significant assets seized. Dwek's information assisted my application on behalf of the Estates seeking the return of more than $400,000.00 from the government of the forfeited funds. Based upon conversations to date, I believe the Estate will recover this money.

K.     <u>Real estate</u>. With Dwek's assistance, I have liquidated approximately 234 properties netting the Estates approximately $26,134,385.34. Approximately $116,839,998.52 has been repaid to Secured Creditors, and approximately $800,000.00 to municipalities in taxes, sewer and other charges. Dwek provided assistance with the liquidation of the real estate portfolio and consulted with respect to his knowledge of each of the properties including those that required immediate repair, provided environmental reports when applicable and helped advertise the sales of the properties that helped bring additional bidders to the auctions.

L.     <u>Miscellaneous benefits</u>. Dwek help prepare 81 bankruptcy petitions; he disclosed the background and existence of numerous deposits he placed on property purchasers never consummated resulting in the return of more than one hundred thousand dollars; provided the facts and background with respect to escrows held by various towns in connection with various construction projects; and provided the background information necessary to object to and expunge over a billion dollars in claims filed against the Estates

### Conclusion

19.     Solomon Dwek was the centerpiece of a web of deception, moral and political corruption, criminal activity, lies, scandal, physical threats, greed and pretty much a case that brought out the worst of the human experience. The clear fact is Solomon Dwek could not and

did not accomplish this alone. But while comparably few faces were visible the full thrust of their secret and deceptive dealings were not. Others were not so visible and those persons and their illegal activities required exposure during the bankruptcy. Whether Solomon Dwek had an epiphany, or simply tried to save himself or felt betrayed or victimized is a story for another time, place and person. The fact remains that any reasonable return to creditors and those in this bankruptcy proceeding that he defrauded required his open dialogue and admission of his sordid activities. To the extent he received a stipend and expenses as compensation to support his wife and five children from the recovery of the very funds he stole is the result of an imperfect world where we never truly answer the question as to "whether the end justifies the means." This is not something I easily accepted. However, Solomon Dwek weaved a ball of yarn and without the yarn spinner it would have proven impossible to unravel. Dwek's time and knowledge was necessary to accomplish the recoveries made and that will be made. In my business judgment I could not have compelled his level of cooperation without payment of the Monthly Stipend, reimbursement of his out of pocket expenses and security set forth herein.[3]

20.     I have tried my best over the past three years, every day and every hour (in many instances simply unrecorded) to meet my responsibilities, both administrative and legal, and tried always to be fair in administering this case. I considered always the Court, the United States Trustee, the Official Committee of Unsecured Creditors, individual Creditors, the litigants, the

---

[3] *See In re Psychrometric Systems, Inc.*, 367 B.R. 670, 674 (Bankr.D.Colo.2007) (The trustee is given ample discretion to administer the estate, including authority to conduct public or private sales of estate property.... The appropriate standard used by courts in reviewing a trustee's recommendation has been enunciated in myriad ways. These variations all fall under the rubric of the business judgment test. The trustee's business judgment is to be given great judicial deference) *See also. In re Eastwind Group, Inc.*, 303 B.R. 743, 750 (Bankr. E.D.Pa. 2004)(the Court should avoid second-guessing the Trustee in the exercise of his business judgment but rather should endeavor to ascertain whether the terms of the Trustee's proposed settlement fall below the lowest range of reasonableness).

United States Attorney in every decision made and the possible repercussions that may come from one or more of these constituencies. In doing so, I concluded that overall the compensation and reimbursement was in my business judgment reasonable and necessary under these very unique circumstances.

    I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 4, 2010                      By: */s/ Charles A. Stanziale, Jr.*
                                                  Charles A. Stanziale, Jr.,
                                                  *Liquidation Trustee*